IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

HORTICA-FLORISTS' MUTUAL
INSURANCE COMPANY                                                              PLAINTIFF

VS.                                            CASE NO. 07-cv-1119

PITTMAN NURSERY CORPORATION,
DONNA SUE PITTMAN KING,
ARCELIA MONTIZE, EVENCIO GARCIA,
AGUSTIN GARCIA GONZALEZ,
and JOHN-MICHAEL HUNTER                                                        DEFENDANTS

## MEMORANDUM OPINION

Before the Court is a Motion for Partial Summary Judgment filed by Plaintiff, Hortica-Florists' Mutual Insurance Company ("Hortica"). (Doc. 96). Separate Defendant Pittman Nursery Corporation ("PNC") has responded. (Docs. 103, 106). Separate Defendants Arcelia Montize, Evencio Garcia, and Agustin Garcia Gonzalez also have responded. (Doc. 101). Hortica filed a reply. (Doc. 108). PNC has filed a sur-reply. (Doc. 111). The Court finds this matter ripe for consideration.

## I. BACKGROUND

This declaratory judgment action arises from a Greenhouse Grower Business Package Policy ("Business Package Policy") issued by Hortica[1], to PNC[2] in 2002. The Business Package Policy contains a variety of insurance coverages, including the following: the Commercial General Liability

---

[1]Hortica's principal place of business is located in Edwardsville, Indiana.

[2]PNC's principal place of business is located in Magnolia, Arkansas.

Coverage; the Employee Dishonesty Coverage; the Employment Practices Liability (Claims Made) Coverage; and the Counterfeit Money, Forgery, or Alteration Coverage ("Alteration Coverage"). PNC became involved in numerous lawsuits and demanded that Hortica defend the company against these lawsuits per its insurance coverages.

Hortica asserts in its Motion for Partial Summary Judgment that it has no duty to defend PNC under any of the insurance coverages it issued to PNC. This order will address Hortica's argument that it has no duty to defend PNC in two separate cases currently pending before the Court, the Montize and Hunter Litigations.

## II. SUMMARY JUDGMENT STANDARD

The standard of review for summary judgment is well established. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed. 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed. 202 (1986). In deciding a motion for summary judgment, the Court must consider all the evidence and all reasonable inferences that arise from the evidence in the light most favorable to the nonmoving party. *See Nitsche v. CEO of Osage Valley Elec. Co-Op.*, 446 F.3d 841, 845 (8th Cir. 2006). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). Genuine issues of material fact exist when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at

249. A party opposing a motion for summary judgment "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III.  DISCUSSION

Generally, the duty to defend is "determined by comparing the allegations in the underlying complaint to the scope of the coverage provided by the insurance policy." *Cooley v. State Farm Fire and Cas. Co.*, No. 4:09CV00332, 2009 WL 2828027, at *2 (E.D. Ark. Aug. 31, 2009) (citing *Insurance Co. of North Am. v. Forrest City Country Club*, 819 S.W.2d 296 (Ark. 1991)). "It is the allegations made against the insured, however groundless, false, or fraudulent such allegations may be, that determine the duty of the insurer to defend the litigation against its insured. *Madden v. Continental Cas. Co.*, 53 Ark. App. 250, 922 S.W.2d 731, 734 (1996). If an injury or damage is within the policy coverage and could result in a lawsuit, the duty to defend arises. *Id*. In other words, the duty to defend arises where there is a possibility that the injury or damages may fall within the policy coverage. *Medical Liability Mutual Ins. Co. v. Alan Curtis, LLC*, 519 F.3d 466, 476 (8th Cir. 2008) (applying Arkansas law). "Any ambiguity in the policy must be construed in favor of the insureds, and if the policy can reasonably be interpreted to encompass some of the claims, the insurer is obligated to provide the insured with a defense." *Id*. (citing *Murphy Oil USA Inc. v. Unigard Sec. Ins. Co.*, 61 S.W.3d 807, 814 (Ark. 2001)).

A.  The Montize Litigation

On August 23, 2007, Arcelia Montize, Evencio Garcia, and Agustin Garcia Gonzalez filed a civil complaint in this Court against PNC, Pittman Properties Limited Partnership #1, D&M

3

Pittman Inc., Dawood Aydani, and Mickey Pittman.[3] The Montize Litigation alleges that Dawood Aydani, then the President of PNC, required workers from its Mexican workforce to pay him $1,000 cash in order to maintain their employment with the company for the following work season. Because the workers had to pay this money, they allege that their wages did not meet the minimum wage standards set by the Fair Labor Standards Act, 29 U.S.C. § 216.[4] PNC argues that Hortica has a duty to defend the company in the Montize Litigation because the claims in the Montize Litigation are covered under the Business Package Policy.

### 1. *The Commercial General Liability Coverage*

The Commercial General Liability Coverage provides PNC with a limit of $1,000,000 for any occurrence of bodily injury and property damage liability and an aggregate policy limit of $2,000,000. The Commercial General Liability Coverage provides that Hortica will pay "those sums the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which the insurance applies."[5] The policy further provides that the insurance applies only if the "'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the

---

[3]*Arcelia Montize, Evencio Garcia, and Agustin Garcia Gonzalez v. Pittman Properties Limited Partnership #1, D&M Pittman, Inc., Dawood Aydani, Mickey H.Pittman, and Pittman Nursery Corp.*, Case #: 1:07-cv-01073-HFB, in the U.S. District Court, Western District of Arkansas, El Dorado Division.

[4]The Montize Defendants also allege that Mr. Aydani's repeated acts of extortion constitute a pattern of racketeering and are therefore actionable under the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. § 1961, *et. seq*. The Montize Defendants have requested certification of a class of all Mexican Nationals employed by PNC as seasonal agricultural workers since 2004, pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3).

[5]The Commercial General Liability Coverage also contains a duty-to-defend clause, which states that Hortica will "have the right and duty to defend the insured against any 'suit' seeking [damages for bodily injury or property damage]."

4

'coverage territory.'" The insurance contract excludes coverage for bodily injury or property damage "expected or intended from the standpoint of the insured." Hortica argues that it does not have a duty to defend PNC in the Montize Litigation under the Commercial General Liability Coverage because the complaint in the Montize Litigation fails to allege "property damage" caused by an "occurrence," as those terms are defined in the policy.

Because the issue of the duty to defend requires an analysis of the meaning of the terms "occurrence" and "property damage," the Court must determine whether the definitions of these terms are ambiguous as worded in the policy. The construction of written contracts are matters to be determined by a court, not by jury, except when meaning of the language depends upon disputed extrinsic evidence. *Southall v. Farm Bureau Mut. Ins. Co. of Ark.*, 276 Ark. 58, 632 S.W.2d 420, 421 (1982). Whether language is ambiguous is a question of law. *Castaneda v. Progressive Classic Ins. Co.*, 357 Ark. 345, 351, 166 S.W.3d 556, 561. Language is ambiguous when there is doubt as to its meaning and it is fairly susceptible to more than one reasonable interpretation. *Id*. Language is unambiguous if it is reasonably susceptible to only one interpretation. *Curley v. Old Reliable Cas. Co.*, 85 Ark. App. 395, 398, 155 S.W.3d 711, 713 (2004).

Under Arkansas law, courts must give effect to the plain meaning of unambiguous language in an insurance policy. *Castaneda*, 166 S.W.3d at 560. When the language is ambiguous, courts will construe the language "liberally in favor of the insured and strictly against the insurer." *Elam v. First Unum Life Ins. Co.*, 346 Ark. 291, 297, 57 S.W.3d 165, 169 (2001). However, a court should not use the rule of strict construction against the insurance company so as to bind the company issuing the policy to a risk that has been plainly excluded and which also has not been paid for. *See Smith v. Shelter Mut. Ins. Co.*, 327 Ark. 208, 210, 937 S.W.2d 180, 182 (1997).

5

## 2. The Montize Complaint alleges an occurrence

Hortica argues that the claims in the Montize Litigation do not allege an "occurrence" as defined by the Commercial General Liability Coverage. Hortica correctly states that the term "occurrence" as defined in the policy means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 97). However, the policy does not define the word "accident." Under Arkansas law, the failure of a policy to define a term does not always render the term ambiguous. "Case law has consistently defined an 'accident' as an event that takes place without one's foresight or expectation—an event that proceeds from an unknown cause, or is an unusual effect of a known case, and therefore not expected." *Essex Ins. Co. v. Holder*, 370 Ark. 465, 261 S.W.3d 456, 460 (2007). Arkansas courts, as well as this District Court, have held that the term "accident" is an act that was unanticipated from the standpoint of the insured. *See Silverball Amusement, Inc. v. Utah Home Fire Ins. Co.*, 842 F. Supp. 1151, 1157 (W.D. Ark. 1994) (citing COUCH ON INSURANCE 2D, (Rev. Ed.) Sec. 41:14, at 20-21)*; see also Maloney v. Maryland Cas. Co.*, 167 S.W. 845, 848 (Ark. 1914). Here, there is no evidence that PNC expected or anticipated Mr. Aydani's alleged acts of extortion.

The problem arises when cases, such as the present case, involve both negligent and intentional acts. In *Silverball*, the occurrence giving rise to the dispute was an intentional crime, the sexual molestation of a minor business invitee committed by an employee of Silverball. 842 F. Supp. at 1152. The minor's mother sued Silverball for negligent hiring. *Id*. at 1153. Silverball, the insured, filed a declaratory judgment action against its insurer, which refused to defend the insured against the claim of negligent hiring. *Id*. The Court held that, although sexual molestation is an intentional act with consequences that a plain ordinary person would expect and intend, Silverball's

alleged liability rested on its negligent hiring and supervision of the molester and not the molestation itself. *Id*. at 1154. The case involved both negligent and intentional acts: (1) Silverball's hiring, which was allegedly negligent; and (2) the minor's molestation, which was intentional. *Id*. The Court held that it was impermissible to allow the intentional act to devour the negligent act for the purpose of determining coverage *Id*. at 1163. Courts should "deal with each act on its own merits and recognize that employers who make negligent hiring decisions clearly do not intend the employees to inflict harm." *Id*. Based on the Court's finding that the term "accident" encompassed the acts of negligent hiring, the Court held that an insurer must provide coverage and a legal defense to an insured where the complaint alleges that an employer was negligent in hiring an employee who subsequently commits an intentional tort. *Id*. at 1157, 1165.

In the present case, Mr. Aydani allegedly required each of the plaintiffs in the Montize Litigation to pay him $1,000 so that he would sign the necessary paperwork enabling them to renew their work visas and to return to PNC the following year. Hortica argues that Mr. Aydani's acts of extortion from the plaintiffs in the Montize Litigation was not an accident, but rather an intentional act, and thus excluded from the policy. However, just as in *Silverball*, the complaint in the Montize Litigation claims that PNC was negligent in its hiring and supervision of Mr. Aydani while he worked as President of PNC. Many courts have held that the insurer is obligated to provide a defense whenever a third party's complaint includes at least one claim that is within the scope of the liability coverage. *Silverball*, 842 F. Supp. at 1162; *see also Hartford Cas. Co. v. Cruse*, 938 F.2d 601 (5th Cir. 1991); *Town of Kimball v. Aetna Cas. and Sur. Co.*, 667 F.2d 439 (4th Cir. 1981).

The Court finds the holding in *Silverball* to be persuasive. Here, the term "occurrence" is basically defined as an accident, which includes direct acts of negligence, such as unreasonable care

7

in supervising and hiring employees. *See Silverball*, 842 F. Supp. at 1164 (citing *U.S. Fidelity & Guar. v. Toward*, 734 F. Supp. 465, 467 (S.D. Fla. 1990)). Based on the claims against PNC in the Montize Litigation and the policy language, the Court finds that the allegations of negligent hiring and supervision in the Montize Litigation is most likely an "occurrence" from the standpoint of PNC despite the alleged intentional conduct by Mr. Aydani.

### 3. *The Montize Complaint alleges property damage*

Hortica also argues that the complaint in the Montize Litigation fails to allege "property damage" as required by the policy. PNC asserts that the money taken from the plaintiffs in the Montize Litigation by PNC's employee, Mr. Aydani, resulted in the loss of tangible property. The policy defines the term "property damage":

"Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

PNC asserts that section (b) of the Commercial General Liability Coverage covers the Montize Litigation, because the plaintiffs in the Montize Litigation lost their cash money when Mr. Aydani allegedly extorted it from them. Therefore, the Court must decide if money is considered "tangible property."

Arkansas courts have yet to expressly rule on whether or not money is tangible property, but other jurisdictions have decided this issue. Generally, the right to receive money and the loss of that right does not constitute the loss of use of tangible property. *See Mutual Services Cas. Ins. Co. v.*

*Co-op Supply, Inc. of Dillon, Mont.*, 699 F. Supp. 1438, 1441-42 (D. Mont. 1988) (holding that the loss of past and future salary as a result of a wrongful discharge was a claim for economic loss and not the loss of use of tangible property). However, once money is in its tangible form, many jurisdictions consider it tangible property. *See Capital Indem. Corp. v. Wright*, 341 F. Supp. 2d 1152, 1159 (D. Nev. 2004) (holding that money stolen from an elderly resident constituted tangible property once the money was in physical form); *Security State Bank of Kansas City v. Aetna Cas. & Sur. Co.*, 825 F. Supp. 944, 947 (D. Kan. 1993) ("The destruction of a stack of currency could certainly be considered a destruction of tangible property."); *Mack v. Nationwide Mut. Fire Ins. Co.*, 517 S.E.2d 839, 840 (Ga. Ct. App. 1999) ("Money can be confused with tangible property only when there is a matter relating to specific coins or notes.")

In the present case, the plaintiffs in the Montize litigation allege that they paid Mr. Aydani $1,000 cash in order to return to work for PNC the following work season. This case is similar to *Wright*, where the court held that money, which was already in physical form, constituted the loss of tangible property. *Wright*, 341 F. Supp. 2d at 1159. Taking the facts in the light most favorable to PNC, the plaintiffs in the Montize Litigation paid Mr. Aydani $1,000 in cash, and because this money was in physical form, it could be viewed as tangible property. Thus, the plaintiffs in the Montize Litigation have alleged in their complaint a loss of use of tangible property. Accordingly, the Court finds that there is an allegation of an "occurrence" that led to "property damage" as required by the Commercial General Liability Coverage. Because there is a possibility that the injury or damages alleged in the Montize Litigation may fall within the scope of the Commercial General Liability Coverage, Hortica has a duty to defend PNC in the Montize Litigation.

B. The Hunter Litigation

Separate Defendant John-Michael Hunter filed suit ("Hunter Litigation") in the Circuit Court of Columbia County, Arkansas, against PNC, alleging that he was denied severance pay under an employment contract that he had with PNC. John-Michael Hunter alleges that he had a written contract with PNC, and under this contract, he was due ninety days notice of termination, and if notice was not received, he was entitled to receive severance pay totaling ninety days of salary. PNC alleges that there was never an employment contract between it and John-Michael Hunter and that any such document that purports to be an employment contract is a forgery.

*1. The Employment Practices Liability Endorsement: Claims Made*

Under the Employment Practices Liability Endorsement ("Employment Practices Coverage"), Hortica agrees to pay "those amounts the INSURED is legally required to pay by reason of a CLAIM brought against any INSURED for a WRONGFUL EMPLOYMENT PRACTICE to which this insurance applies." The Employment Practices Coverage states that Hortica has the right and duty to defend any claim brought against Hortica for a wrongful employment practice to which the insurance applies. "Wrongful Employment Practice," as defined by the policy, includes the following actions: actual or alleged wrongful dismissal, retaliatory discharge, employment related misrepresentation to an employee, and interference with an employment contract by an insured against an employee.[6] However, the Employment Practices Coverage excludes from coverage "[a]ny damages arising out of any 'written employment contract'" and "any claim the insured assumes under any contract or agreement."

---

[6]The policy definition of "wrongful employment practice" includes several other specifically named actions as well.

Hortica argues that all the claims in the Hunter Litigation are based on an alleged written employment contract between Hunter and PNC; thus, these claims are excluded from coverage under the Employment Practices Coverage. Courts must strictly interpret exclusions to insurance coverage and are required to resolve all reasonable doubt in favor of an insured who had no part in the preparation of the contract. *Home Mutual Fire Ins. Co. v. Jones*, 63 Ark. App. 221, 229, 977 S.W.2d 12 (1998) (citing *McGarrah v. Southwestern Glass Co.*, 41 Ark. App. 215, 852 S.W.2d 328 (1993)). "If there is doubt or uncertainty as to the policy's meaning and it is fairly susceptible to two interpretations, one favorable to the insured and the other favorable to the insurer, the former will be adopted." *Id*. When a reasonable interpretation may be given to the contract that would justify recovery, the Court must do so. *Id*.

Here, the policy states that Hortica will pay those amounts PNC is legally required to pay by reason of a claim arising out of PNC's wrongful employment practice. The policy specifically includes interference with an employment contract as a wrongful employment practice. The policy then goes on to exclude any damages arising out of any written employment contract and any claim PNC assumes under any contract or agreement. It is incongruous for Hortica to plainly include a risk only to exclude it a few paragraphs later. *See id*; *see also American Investors Life Ins. Co. v. Butler*, 76 Ark. App. 355, 361, 65 S.W.3d 472 (2002). Bearing in mind the aforementioned principles of construction, the Court interprets the policy in favor of PNC and holds that there is a possibility that the claims in the Hunter Litigation fall within the Employment Practices Coverage. Thus, Hortica has the duty to defend PNC in the Hunter Litigation.

*2. Policy Limits*

Hortica argues that, even if coverage exists for the Hunter Litigation under the Employment Practices Coverage, Hortica still has no duty to defend PNC because the entire limit of liability of the Employment Practices Coverage has been exhausted by defense expenses in the Montize Litigation and a state court action filed by Mr. Aydani against PNC. The total aggregate limit under the Employment Practices Coverage is $100,000. This amount is the most Hortica will pay for the combined total of all claims first made or brought during the policy period for losses that result from all wrongful employment practices. The total aggregate limit of the Employment Practices Coverage is reduced by defense or other costs incurred in defending or settling a claim made during the policy period.

Three lawsuits were filed against PNC during the applicable policy period, which is January 1, 2007, to January 1, 2008. Two of these lawsuits were the Montize and Hunter Litigations. The third lawsuit was filed in state court by Mr. Aydani against PNC, and this lawsuit included a claim for wrongful termination.[7] However, the Court is unaware of how much money Hortica spent defending PNC or in settling the claim in this state court action.[8] Similarly, the Court is unclear as to how much money, if any, Hortica has spent defending PNC in the Hunter Litigation. Accordingly, because the Court is unaware of how much money Hortica has spent so far in defending or settling the claims in the Hunter Litigation and the Aydani state court

---

[7]Wrongful termination is specifically included in the definition of "wrongful employment practice" under the Employment Practices Coverage.

[8]The Court is aware that this lawsuit has been dismissed with prejudice.

case, the Court cannot determine at this time whether the $100,000 total aggregate limit of the Employment Practices Coverage has been exhausted.[9]

## IV. CONCLUSION

For the reasons discussed herein, the Court finds that Hortica has a duty to defend PNC in the Montize and Hunter Litigations. Accordingly, Hortica's Motion for Partial Summary Judgment (Doc. 96) is **DENIED**. An order of even date, consistent with this opinion, shall issue.

IT IS SO ORDERED, this 2d day of March, 2010.

/s/ Harry F. Barnes
Hon. Harry F. Barnes
United States District Judge

---

[9]The Court found that there is a possibility that the claims in the Montize Litigation are covered by the Commercial General Liability Coverage and thus the duty to defend arises under that section. The Court understands from the policy language that the defense costs paid by Hortica in the Montize Litigation will be attributed to the Commercial General Liability Coverage limits, as the primary insurance, and not to the Employment Practices Coverage limits.